IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BRADYN S., BY NEXT FRIENDS                §
JUSTIN S. AND MEGHAN S.,                   §
                                           §
        Plaintiff,                         §
                                           §
v.                                         §          CIVIL ACTION NO. 3:18-cv-2724-E
                                           §
WAXAHACHIE INDEPENDENT                     §
SCHOOL DISTRICT, et al.,                   §
                                           §
        Defendants.                        §

## MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of a Special Education Hearing Officer for the Texas Education Agency.  Minor child Bradyn S., by his next friends and parents, a student in the Waxahachie Independent School District alleged the district failed to provide him with a free appropriate public education under the Individuals with Disabilities Education Act.  Following a hearing, the Special Education Hearing Officer found that the district provided the Student with a free appropriate public education.  Before the Court are cross motions for judgment on the administrative record:  Defendant's Motion for Judgment on the Administrative Record (Doc. 60) and Plaintiff's Motion for Summary Judgment Pursuant to the Administrative Record (Doc. 62). For reasons that follow, the Court grants Defendant's motion and denies Plaintiff's motion.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves the 2016-2017 school year, when Bradyn S. ("the Student") was in third grade at Felty Elementary in the Waxahachie Independent School District ("WISD").  In a

nutshell, the Student contends he was denied a free appropriate public education ("FAPE") because WISD did not appropriately address his behavior problems during that school year.

When the Student was in kindergarten at a different WISD elementary school, WISD determined he qualified for special education services as a student with autism and speech impairments.  WISD rezoned and the Student moved to Felty Elementary in first grade.  The Student's Admission, Review, and Dismissal Committee ("ARD Committee" or "Committee") developed his Individualized Education Program ("IEP").

At the start of the 2016-2017 year, the Student was in a structured instruction class, for students who need individualized structured schedules and daily routines based on their social and educational needs.  The class was for grades three through five.  Eight students were in the class with special education teacher Tracy Gooch and two other staff members.  The Student was in Gooch's room all day except for when he went to general education for specials and math class.  At some point, a decision was made to put the Student in the other structured instruction class, taught by Lora Lockamy,  for a portion of his day.  He was placed with younger students.  He would start the day in Gooch's class, go to Lockamy's class from 8:30am to 1:00pm, and then return to Gooch's class until dismissal.

On October 7, 2016, WISD completed its full and individual evaluation ("FIE") of the Student, which was a three-year reevaluation of his original FIE.  WISD's licensed specialist in school psychology noted progress in the Student's behavior since kindergarten.  The Student's IQ was 77, below average, and his academic achievement was below average.

The ARD Committee met again on October 11, 2016 to review the Student's IEP.  The Committee members were Carrie Kazda, the school principal; special education teacher Gooch; general education teacher Shannon Goretska; diagnostician Lucy Walter; occupational therapist

Elizabeth Dobson; and speech pathologist Kayla Miller.  The Student's Mother was unable to attend the ARD meeting because she was about to have a baby.  She gave permission for the Committee to proceed.  The Committee determined the Student still met the criteria for speech/language impairment and autism and thus had a need for special education services.  At the October 2016 ARD Committee meeting the decision was made to remove the Student from general education for math because it was beginning to be a frustration for him.

The Student's parents called for the special education due process hearing following an incident at school on March 3, 2017.  On that date, the Student attacked school staff and his classroom was evacuated as a result of his behavior.  His teacher called the police, and the Student was restrained and handcuffed.  The parties agree that the Student's behavior deteriorated beginning in February 2017.  They disagree in their characterizations of the severity of the Student's behavioral issues in the 2016-2017 school year prior to that time.  The Student maintains WISD has deliberately attempted to minimize the behavioral issues he was having at that time and that he was denied a FAPE as a result.

On March 9, 2017, the Student's Mother filed the request for a due process hearing alleging WISD failed to provide the Student with a FAPE under the Individuals with Disabilities Education Act ("IDEA").  Among other things, the Student's parents sought a finding that WISD denied the Student a FAPE, an order requiring WISD to reimburse the Student's parents for any services they privately obtained due to the denial of a FAPE, including hospitalization and counseling, and compensatory education in the form of private tutoring, behavior intervention, and counseling.

On May 9 and 10, 2018, the due process hearing was held.  The Student called several witnesses:  his Mother; Dr. Adiaha Spinks-Franklin, a pediatrician; his teacher Tracy Gooch; Waxahachie Police Officer Derrick Young, who responded to the school's 911 call on March 3,

2017; Erin Edmondson, WISD behavior specialist; and Principal Kazda.  WISD called special education teacher Lora Lockamy; WISD's lead diagnostician Ria Michener; and Diane Chapell, WISD's director of special education.

The Student's Mother did not think his IEP sufficiently addressed his behavioral issues. She testified that his behavior got progressively worse after the 2016-2017 IEP was put in place. She said the first month of school was good, but behavioral incidents began in September. Petitioner's Exhibit 8 are copies of "choice sheets" that were sent home with students each day. The Student's teacher made a note about his behavior each school day, and a parent was to initial the sheet.  The choice sheets noted the following incidents that occurred on various days prior to the Student's ARD Committee meeting in mid-October:  the Student spit in another student's face on the playground; during PE, the student would not follow staff directions to stop touching private parts and spitting on the gym floor; he was disrespectful to teachers and students, hit staff members; he ran in the hallways and away from teachers and used unkind words to teacher and students; in art class he tried to stab another student and staff with a pencil, he used foul language, slapped a student with a ruler, did not follow directions in the cafeteria and hit a teacher; he did not follow directions or rules at recess and hit students and climbed fences; and he was "very ancy" [sic] and used a loud voice to seek attention from peers and ran out of class and down the hallway. After the ARD Committee meeting, the choice sheets reflect behavior issues on some days, such as running in the hallway and hitting other students.

Sometimes the Student's behavior warranted a disciplinary incident report, written up on a "Notification of Disciplinary Incident" form.  On September 28 and 29, the Student's behavior was written up in such a report.  On September 28, the Student came into the classroom upset in the morning.  The other students were evacuated from the classroom.  The Student went to the

nurse and calmed down.  Later, in Mrs. Goretska's classroom, he got upset and ran out.  He hid in the bathroom.  When school personnel came in, he threw wet paper towels at them.  In a bathroom stall, he began to climb up on the fixtures and was in danger of hurting himself.  Gooch restrained him and he was transported to the office area.  His Mother came and was able to calm him down. He was suspended for the rest of the day and went home with his Mother.

Because the Student was restrained during this incident, a "Written Summary of Restraint Use" form was filled out and provided to the Student's parent.  It includes descriptions of the reasons for restraint and the type of restraint used—CPI Children's Control Position.  The form states that the information will be filed in the Student's special education eligibility folder so that the ARD Committee can use the information in considering the need for changes in the IEP and/or Behavioral Intervention Plan ("BIP").

On September 29, the disciplinary incident report states that because the Student ran down the hall out to the playground for recess, he was asked to go back inside to practice walking safely. He refused and remained on a play structure and hit other students who got near him.  He then jumped off the equipment and ran into a school parking lot.  He began throwing big rocks on the concrete.  He eventually complied and came inside for lunch.  At lunch, he spit on a student and also shot spit wads into that same student's face.  He was moved to another table, but continued to taunt the other student.  The behavior specialist recommended that the Student choose between two consequences.  The Student chose to eat lunch by himself the following day.

The next disciplinary incident report was for November 3, 2016.  The Student began spitting to agitate others.  He refused to stop when asked and his behavior escalated to the point where he began to hit another student.  He cursed at a staff member who was giving him direction. He lost classroom privileges that day as a result.  Between November 3 and February 2017, there

were no disciplinary incident reports for the Student.  Then in February, there were five of them on February 8, 9, 15, 16, and 27.  On February 8, he ran out of the school building and into a secure area where he started throwing chairs and bricks and trying to turn over picnic tables.  On February 9, he got upset and threw his chair.  He proceeded to destroy the entire classroom, meaning he knocked over tables, desks, and chairs and emptied cabinets.  He raised scissors at staff.  He was restrained for safety reasons.  He and his Mother cleaned up the mess and his Mother took him home.  On February 15, he started knocking over desks and hitting staff.  He also used foul language.  Staff had to restrain him for safety reasons.  On February 16, he hit another student and hit a teacher.  He began to hit and kick staff members and bang his head on windows.  Restraint was used to prevent him from hurting himself or others.  On February 27, he got upset and started taking apart equipment in the motor lob, dumping out toys, and throwing items across the room.  His behavior escalated again while he was cleaning up the motor lab.  He began climbing on the shelves and cabinets and throwing objects.

On February 28, 2017, Lucy Walter, the school diagnostician, requested that a behavior specialist do a Functional Behavioral Assessment ("FBA") and a BIP due to the Student's recent behavior issues.

Then on March 3, 2017, the Student took off his shoe during a group art project.  He got upset when asked to put it back on and threw his shoe at the white board.  When asked what was bothering him, he immediately pushed over his desk and became aggressive.  He threw his chair and started hitting staff.  The classroom was evacuated.  He tried to hit and kick the other students as they left the room.  His behavior escalated and he began throwing chairs at staff and at the windows.  His teacher called the police.  When an officer entered the classroom, the Student threw a chair at the officer and hit him.  The Student was restrained and handcuffed.

After the March 3 incident, the Student's Mother kept him out of school for some time.  He spent time in a behavioral hospital.  He returned to school after spring break.  His classroom setting changed when he returned.  He did not return to Gooch's classroom; he was assigned to Lockamy's room for the rest of the year.

Principal Kazda testified that the Student's Mother requested an ARD Committee meeting to deal with her son's behavior when she came to pick him up on March 3, 2017.  Kazda told her the school wanted to do an FBA and a BIP and that the paperwork for that would be sent home.  Mother said that was okay.  To Kazda's knowledge, Mother had not requested an ARD before that.  Mother and the ARD Committee agreed to meet on Monday, March 20, 2017.

On March 6, WISD proposed to evaluate the Student's present levels of academic and functional performance and education needs, as well as whether any additions or modifications to the special education and related services are needed to enable him to meet the goals set out in his IEP and to participate in the general curriculum.  WISD requested an FBA and a BIP and parent training evaluation.  Parental consent was required prior to conducting the evaluation.  The Student's Mother did not consent.

Notices of the scheduled March 20 ARD Committee meeting were sent by mail to the Student's parents twice.  There was a page for them to indicate whether they would attend the meeting, wanted it rescheduled, or wanted the meeting to take place without them, and other options.   As of March 16, they had not responded.  On Saturday, March 18, an advocate for the family emailed to cancel the ARD Committee meeting.  The Committee did not meet on March 20.  Kazda testified that parental consent is not needed to request an ARD Committee meeting.

Diane Chapell, WISD director of special education, testified that after the March 20 ARD Committee meeting was cancelled by the parents, Chapell instructed her team to use the

7

amendment process, which does not require a formal meeting, and request the FBA and BIP in hopes the parents would consent to move forward.  The ARD Committee met and amended the Student's IEP and sent Mother a copy of the amendment.  She declined to sign it.  She testified that it did not address all her concerns.  Mother never agreed to the IEP amendment or gave consent for the FBA. Mother never requested another ARD Committee meeting.

WISD scheduled a March 24 resolution meeting with the Student's parents to work to resolve the due process complaint.  Mother ended up not being able to attend because the Student was "going through a lot at that time."  The meeting was rescheduled for April 7.  Mother came to the meeting but left because special education teacher Gooch, who was not at school that day, was not at the meeting.

Dr. Spinks-Franklin is a board certified developmental behavioral pediatrician.  She reviewed the Student's records and met with his Mother, but did not meet him.  The doctor stated that the Student's disciplinary records showed pretty significant disruptive behavior from 2014 to 2017.  She testified that the Student needed more support.  In October 2016, she would have asked for a consultation from the district's autism specialist and asked for an FBA and a BIP.

Tracy Gooch was the Student's teacher at the start of the 2016-2017 year.  Gooch had special education training and applied behavior analysis training and restraint training.  She worked with the behavior specialist who had an emphasis in autism, Erin Edmondson.  She testified that at the beginning of the school year, the Student had very good days and some days he got agitated and had behavior incidences.  Sometimes he was frustrated by academic tasks and sometimes he was frustrated by other things such as the behavior of other students.  She described the strategies she used to get him to cool down, including sending him to the nurse who would rub oil on the back of his neck, going for a walk, or going to get a drink.  She testified that the Student's

behavior was not impeding his ability enough to have BIP before the spring of 2017.  His repetitive explosive outbursts within a very short timeframe that caused harm to himself led to the recommendation of a BIP.  She testified that in February she got a new student in her classroom and the behavior that student exhibited bothered the Student very much.  Gooch testified that the Student had behavioral issues that were not necessarily tied to academic frustration.  She stated that the Student's parents never requested a conference with her or contacted her with questions about the behavior charts.  Regarding the move to Lockamy's classroom with younger students, Gooch testified this environment was more calming for the Student.  Being the older student in the room was beneficial for him.  Gooch testified the Student was making "very slow" academic progress.

Erin Edmondson, a behavior specialist for WISD, has a master's degree in autism.  Before she was a behavior specialist, she was the Student's first grade teacher in a structured instruction class.  Her job as behavior specialist was to brainstorm and work with, and support all teachers in the district.  She conducts FBAs and helps develop BIPs.  She sometimes attends ARD Committee meetings.  She was not part of the ARD Committee that met for the 2016-2017 year.  She testified that the Student had some behavior struggles in September of 2016.  She consulted with his teacher about what was going on with him.  She did not see any need in the fall of 2016 for any changes to his IEP.  In February 2017, Edmondson was contacted about the Student's escalating behavior as was another WISD behavior specialist, Melissa McGuire.  Something needed to be done with the Student's IEP to address his behavior issues.  Edmonson stated they were working to get parental consent for an FBA.  On April 19, 2017, the Student injured McGuire.  He became upset and started throwing objects in the motor lab.  He had previously unplugged a phone located on the teacher's desk.  He eventually picked it up and threw it like a frisbee.  It hit McGuire in the

9

arm.  She passed out and an ambulance was called.  As a consequence, the Student was assigned to an alternative educational setting where he was not with other students while they waited to schedule his MDR, manifestation determination review.

The MDR occurred on May 1, 2017.  The meeting was scheduled at a time the Student's parents agreed to, but they emailed late the night before to say they would not be able to attend. Edmondson participated in the meeting.  The Committee was torn about whether the Student's behavior was a manifestation of his disability.  Because they could not rule out that possibility, they treated it as if it was a manifestation of his disability.  As a result, they developed a safer placement for him.  His triggers had been identified as academic instruction in language arts and math.  For those subjects he would have one-on-one instruction.  He had trouble deescalating in front of his peers so they talked about removing his audience before redirecting him.  The ARD Committee developed a BIP at that meeting. They considered the restraints that occurred in February, among other things.  They looked at the targeted behaviors and put together strategies for each one.  For example, one of the Student's targeted behaviors was responding to redirection by complying or using cool-down options.  At this time in early May, the Student's parents had not yet consented to the requested FBA.  The FBA was not legally required to do a BIP.  Further, the day after the ARD Committee met, on May 2, the Student had a behavior incident.  WISD did not have consent at that time to implement the new plan.  Edmondson testified that prior to the incidents that took place in February of 2017, the Student did not need an FBA or a BIP.

Lora Lockamy, the Student's structured instruction class teacher, testified about the Student's academic progress.  He definitely made improvement; it was slow, steady progress. Since the beginning of the year, the number of letter sounds the Student knew had increased.  He was reading at a kindergarten level at the beginning of the school year and at the end of the year,

he had shown several levels of improvement, although he was still not reading independently.  His comprehension increased as well when he was read aloud to.  He showed some improvement in math as well.  He also made progress on the goals set out in his IEP.  She agreed there was no need for an FBA or a BIP prior to February 2017 because there had not been a pattern of behavior until then.

Ria Michener, the lead elementary diagnostician for WISD, testified about cognitive assessments given to the Student.  As part of the Student's three-year reevaluation in October 2016, he was given a cognitive assessments. Looking at his results, one would predict that he would make academic progress but at a slower rate than students the same age and grade.  Comparing his results from 2013 to 2016, Michener testified that he was making progress, but not at the rate one would expect from his typical peers.  Michener testified that a BIP could be developed without an FBA, but that it was not the best practice.

Diane Chapell also testified that based on the circumstances, February 28, 2017 was an appropriate time to request an FBA and BIP for the Student.

In a decision issued in July 2018, the Special Education Hearing Officer ("SEHO") found that WISD provided the Student with a FAPE and that the Student failed to prove he was entitled to independent evaluations at public expense.  Here, the Student appeals from the SEHO's decision.  He seeks an order reversing the decision of the Special Education Hearing Officer and a judgment awarding compensatory damages, attorney's fees, and costs.

After the 2016-2017 school year, the Student's parents enrolled him in a different school district.

BACKGROUND ON THE IDEA

The IDEA offers federal funds to States in exchange for a commitment—to furnish a FAPE to all children with certain physical or intellectual abilities. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017); *see* 20 U.S.C. § 1400 *et seq*. As defined in the IDEA, a FAPE comprises both instruction tailored to meet a child's unique needs and sufficient supportive services to permit the child to benefit from that instruction. *Fry*, 137 S. Ct. at 748–49. An eligible child acquires a substantive right to such an education once a State accepts the IDEA's financial assistance. *Id.* at 749.

Under the IDEA, an individualized education program or IEP serves as the primary vehicle for providing each child with the promised FAPE. *Id.* The IEP, which is crafted by a child's IEP team of school officials, teachers, and parents, spells out a personalized plan to meet all of the child's educational needs. *Id.* The IEP documents the child's current levels of academic achievement, specifies measurable annual goals for how he can make progress in the general education curriculum, and lists the special education and related services to be provided so that she can appropriately advance toward those goals. *Id.* The IDEA does not entitle a disabled child to an IEP that maximizes his potential, but instead only guarantees a "basic floor" of opportunity "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010). The educational benefit, however, cannot be de minimis; rather an IEP must be likely to produce progress, not regression or trivial educational advancement. *Id.*

The IDEA establishes formal procedures for resolving disputes. First, a dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state education agency. *Id.*; *see* 20 U.S.C. §1415(b)(6). That pleading generally triggers a preliminary

meeting involving the contending parties.  The parties have the option to instead pursue mediation.  If the impasse continues, the matter proceeds to a due process hearing before an impartial hearing officer.  *Fry*, 137 S. Ct. at 749.    Any decision of the hearing officer granting substantive relief must be based on a determination of whether the child received a FAPE.  A parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court.  *Id.*; 20 U.S.C. § 1415 (i)(2)(A).

Ordinarily, the adequacy of an IEP is determined by consideration of the four indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA.  *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 795 (5th Cir. 2020) (citing *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 253 (5th Cir. 1997)).  Those factors, known as the *Michael F.* factors, are:  (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated.  *Michael F.*, 118 F.3d at 253.

The role of the judiciary is not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's.  *R.H.*, 607 F.3d at 1010.  Instead the court's role is limited to determining whether those officials have complied with the IDEA.  *Id.*   The IDEA creates a presumption in favor of a school district's educational plan, placing the burden of proof, by a preponderance of the evidence, on the party challenging it.  *Id.* at 1010–11.

This Court's review of the SEHO's decision is "virtually *de novo*."  *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003).  The Court must receive the state

administrative record and must receive additional evidence at the request of either party.  *Id.*  The

SEHO's findings should be accorded due weight, but this Court is to arrive at an independent

conclusion based on a preponderance of the evidence.  *Id.*  As to credibility, although the Court

reviews the record de novo, as to this issue in particular, it gives the SEHO's findings due weight.

*T.C. v. Lewisville Indep. Sch. Dist.*, No. 4:13cv186, 2016 WL 705930, at *17 (E.D. Tex. Feb. 23,

2016) (citing *D.B. ex re. C.B. v. Houston Indep. Sch. Dist.*, No. Civ.A. H-06-354, 2007 WL

2947443, at *11 (S.D. Tex. Sept. 29, 2007) ("The hearing officer, who hears live testimony and

can observe witness demeanor, is in the best position to determine issues of credibility.")).  In an

appeal under the IDEA, "summary judgment is not directed to discerning whether there are

disputed issues of fact, but rather, whether the administrative record, together with any additional

evidence, establishes that there has been compliance with IDEA's processes and that the child's

educational needs have been appropriately addressed."  *Seth B. ex rel. Donald B. v. Orleans

Parrish Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016).

### THE PARTIES' ARGUMENTS

The parties each filed a motion for summary judgment on the administrative record.  WISD

asks the Court to affirm the SEHO's decision.  It contends it provided the Student with a FAPE in

accordance with the IDEA.  WISD asserts that when the four *Michael F.* factors are applied, the

Student cannot meet his burden to establish the denial of a FAPE.  WISD maintains the

administrative record conclusively establishes WISD designed the Student's IEP to meet his

unique needs thereby allowing him to make progress appropriate in light of his circumstances.

The Student asks the Court to reverse the decision of the SEHO.  He contends each of the

four factors weighs in favor of a finding that the IEP was insufficient.  The Student maintains

WISD has deliberately attempted to minimize the behavioral issues he was having at that time and

the SEHO erroneously adopted WISD's view of the facts.  The Student argues his IEP did not appropriately address his behavior problems and thus denied him a FAPE.  He says his case is analogous to *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003), in which the Eighth Circuit upheld the administrative panel's decision that the student was denied a FAPE.

**ANALYSIS**

1. *IEP was Individualized on the Basis of the Student's Assessments and Performance*

The first *Michael F.* factor is that the IEP is individualized on the basis of the Student's assessments and performance.  The IDEA mandates that in developing a student's IEP, the IEP team (here, the ARD Committee) shall consider: "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child."  20 U.S.C. § 1414(d)(3)(A).  When a child's behavior impedes the child's learning or that of others, the IEP team shall consider the use of positive behavioral interventions and supports, and other strategies to address that behavior.  *Id.* § 1414(d)(3)(B).

The administrative record shows that the ARD Committee developed the Student's October 2016 IEP after determining the Student's Present Level of Academic Achievement and Fundamental Performance (PLAAFP) in English Language Arts and Reading, Math, Adaptive Social Skills, Science, and Social Studies based on review of prior years' IEPs, classroom assignments and activities, placement tests, and staff observations, among other things.  Teachers reported that the Student is frustrated at time with his academics and had some behavior challenges due to that frustration.  The Committee determined that the child's behavior does not impede his own learning or that of others.  Thus, he did not need a BIP.  The Committee determined that the Student's disability affects his involvement and progress in the general education curriculum in

the areas of language arts, math, social studies, and science.  Based on the information reviewed, the Committee set measurable annual goals for the Student in language arts and reading, science, social studies, math, adaptive behavior, and speech therapy.  The IEP called for giving the Student frequent breaks and the opportunity to run or walk outside with staff as ways to manage his behavior.  The Committee recommended that the Student receive part or all instruction in a special education setting.  The ARD Committee considered the least restrictive environment factors and determined the Student would be place in structured instruction in special education for all subjects except for specials classes provided in regular education.  The IEP included training for support staff, behavior management training, and strategies in non-violent crisis intervention.  The IEP also provided for consultations in speech and language therapy and occupational therapy.  It noted concerns with the Student's "negative behavior" such as kicking, hitting, running, and throwing objects.  When the Student's behavior escalated in February 2017, WISD recommended additional evaluations for him.

The Student puts forth several reasons why his IEP was not individualized on the basis of his assessments and performance.  He first contends that WISD failed to acknowledge the severity of his behavioral issues in the fall of 2016 and respond accordingly.  He argues that his numerous behavioral issues were not considered at the October 2016 ARD Committee meeting.  According to the Student, because the Committee did not consider all of his behavior, his IEP was not appropriately individualized.  The Student contends an FBA and a BIP were necessary to individualize his programming.  The Student also contends that the failure to invite WISD's behavior specialist, Erin Edmundson, to the October 2016 ARD Committee meeting demonstrates that his IEP was not individualized.  The Student further contends the ARD Committee failed to consider his September 28, 2016 "restraint form." Finally, the Student argues that his IEP was not

appropriately individualized because it failed to identify or address the antecedents to his behavioral problems.  The Student argues that his behavior was not the result of academic frustration alone, but that was the only trigger listed in the October 2016 IEP.  He also argues that WISD failed to provide for appropriate social skills support in his IEP.[1]

In the 2016-2017 school year, prior to the October ARD Committee meeting, the Student had two behavior incidents that warranted a disciplinary incident report.  The other events cited by the Student did not rise to that level.  There was evidence that the SEHO was entitled to credit that the Student's behavior problems that fall were being effectively managed with the supports in place and that an FBA and a BIP were not necessary until February when the Student's behavior issues escalated.  There was also testimony that the ARD Committee considered the Student's behavior in developing his IEP.  The Court finds that any express failure to indicate that the Committee considered the restraint form does not mean the IEP was not individualized.

The Student's ARD Committee in October 2016 consisted of Principal Kazda; the Student's teachers Goretska and Gooch; diagnostician Walter; an occupational therapist, and a speech pathologist.  The Court does not find that the failure to include Edmondson at that time meant that he did not receive an IEP that was individualized.

Further, Plaintiff has failed to demonstrate that WISD failed to provide him with appropriate social skills training.  He alleges without much detail that the ARD Committee did not give this area sufficient consideration.  The IEP does set behavior goals for the Student, such as

---

[1] Under this factor and others, the Student argues there is a discrepancy between the October 7, 2016 FIE reevaluation and his October 11, 2016 IEP.  He argues that on October 7, a WISD diagnostician found that his behavior impeded his learning and that of others and that a mere four days later, the ARD Committee found that his behavior did not impede his learning and that of others.  The Court finds no such discrepancy.  The reevaluation the Student cites in his brief, (Petitioner's Exhibit 3 at page14), was a reevaluation conducted on March 20, 2017, not the October 7, 2016 reevaluation.

not touching the walls when he walks and not displaying negative behavior, such as hitting. Further, Gooch testified that she worked one-on-one with the Student every day for ten minutes on social skills.  The Court concludes that this factor weighs in favor of WISD.

###### 2. *IEP was Implemented in the Least Restrictive Environment*

The next *Michael F.* factor is that the IEP was implemented in the least restrictive environment.  Under the IDEA, a student must be educated in the "least restrictive environment" appropriate to meet his needs.  20 U.S.C. § 1412(a)(5)(A).  That means that, to the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  *Id.*

The Student contends WISD failed to educate him in the least restrictive environment.  His October 2016 IEP removed him from general education math, decreasing the amount of time he spent in general education.  Also, he was "partially removed" from a class with same-age peers and placed in a structured instruction class with students in lower grades.  In February 2017, the Student's schedule was changed again without an ARD Committee meeting or parent consultation to increase the amount of time the Student had in the classroom with younger students. After the March 3rd incident, the Student was moved to the classroom with younger students full time, again without modification of the IEP or parental agreement.  The Student argues WISD should have provided a BIP to provide behavioral supports before placing him in a more restrictive environment.

Again, there was testimony that a BIP was not necessary until February 2017 when the Student's behavior issues became more frequent and disruptive.  Further, the Court is not persuaded that moving the Student from one structured instruction special education class to another with younger children involves the principal of least restrictive environment.  In addition, there were valid reasons for the move and testimony that it was beneficial for the Student.  The record reflects the change in structured instruction class was not a type of change an ARD Committee needs to make.  The Student has not demonstrated that the IEP was not implemented in the least restrictive environment.

### 3. *Services were Provided in a Coordinated and Collaborative Manner*

The third *Michael F.* factor is that services were provided in a coordinated and collaborative manner that includes the key stakeholders.  The IDEA contemplates a collaborative process between the district and the parents.  *E.R. v. Spring Branch Indep. Sch. Dist.*, No. 4:16-CV-0058, 2017 WL 3017282, at *27 (S.D. Tex. June 15, 2017) (citing *R.H.*, 607 F.3d at 1008).  Under the IDEA, a student's IEP team (here the ARD Committee) means a group composed of: the parents of the child with the disability, not less than one regular education teacher of the child (if the child is participating in the regular education environment); not less than one special education teacher, or where appropriate, not less than one special education provider of the child; a representative of the local education agency who is qualified to provide specially designed instruction to meet the unique needs of children with disabilities, among other things; an individual who can interpret the instructional implications of evaluation results; at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child; and the child whenever appropriate.  20 U.S.C. § 1414(d)(1)(B).

19

The Student contends that services were not provided in a coordinated and collaborative manner for several reasons. First, the Student argues that WISD's failure to acknowledge the severity of his behavioral issues demonstrates that its staff was not working in a coordinated and collaborative manner.  Next, he contends WISD's behavior specialist should have been invited to the Student's ARD.  He also argues WISD's failure to consider his restraint form shows that services were not delivered in a coordinated and collaborative manner.  Additionally, he contends the failure of the ARD Committee to consider positive behavior supports demonstrates the absence of this factor.  Third, there was no coordinated effort by key stakeholders to address the behavioral escalation that occurred in February 2017. He also contends that without a BIP, there was no coordinated response to his behavior issues.

There are many examples in the record of the key stakeholders for WISD in this case coordinating and collaborating.  The Felty staff worked together to try to address the Student's social and educational needs.  For example, the Student's teacher Gooch often consulted with behavior specialist Edmondson on strategies to help the Student calm down when he got agitated. The IDEA does not require a behavior specialist to be on the ARD Committee.  The Court notes that that the parents were invited to collaborate at the October 2016 ARD Committee meeting, and at other meetings, and did not attend.  Further, the parents never consented to an FBA or the amended IEP. The Student has not met his burden to establish WISD failed to coordinate and collaborate with the key stakeholders in implementing the IEP.  This factor weighs heavily in favor of WISD.

4. *The Student Demonstrated Positive Academic and Non-Academic Benefits under his IEP*

The final *Michael F.* factor is whether the Student demonstrated positive academic and non-academic benefits under his IEP.  This is one of the most critical factors in the analysis.  *R.P.*

*ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813–13 (5th Cir. 2012).  Evidence of an academic benefit militates in favor of a finding that an IEP is appropriate.  *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 399 (5th Cir. 2012).

The Student asserts that because his behavior was problematic throughout the school year and he significantly regressed, it is wrong to conclude that he demonstrated positive academic and non-academic benefits under his IEP.  The Student says the SEHO cited progress on behavior goals as a positive academic/non-academic benefit the Student received.  The Student says his behavior did not improve; it spiraled out of control throughout the year and WISD did not address it.

The record contains evidence that the Student made sufficient academic progress to show his IEP was providing a FAPE.  His special education teachers described in detail his progress in different subjects.  The Student was making steady progress, albeit slow progress.  This was consistent with the Student's performance on cognitive testing.  Further, he made progress on other non-academic goals such as walking in the hallway without touching the walls.  He also made progress during the year in being able to verbalize calming strategies he needed to be able to calm down.  The Court finds that this factor weighs in favor of WISD.

The Student's overriding complaint in this appeal is that WISD did not adequately address his behavior issues prior to February 2017, when all agree that the behavior escalated.  He contends this failure extends to and impacts all four factors of the *Michael F.* analysis.  There was credible testimony from multiple WISD personnel, including the Student's special education teachers Gooch and Lockamy who interacted with him in an educational setting daily, that the Student's behavior was being managed with the supports in place in the October IEP.  Their testimony was that there was not a pattern of behavior that warranted an FBA or a BIP until February 2017.  The

SEHO was entitled to credit this testimony over that of the Student's Mother and the expert, who did not meet the Student.  This Court will not disturb that credibility determination.

While there are some similarities between this case and the *Clark* case the Student cites as analogous, the Court is not persuaded by the comparison.  The issue in that case was whether the school district had provided the required behavior management plan necessary to ensure the student got a FAPE.  *Clark*, 315 F.3d at 1025.  A three-member administrative panel chose to credit the expert testimony presented by the student that the student's behavior required the adoption of a formal behavior management plan.  *Id.* at 1025–26.  The district court affirmed the panel decision that the district had failed to provide the student with a FAPE, and the Eighth Circuit affirmed the district court.  *Id.* at 1026.  Thus, unlike this case, it was determined at the administrative stage that a FAPE was not provided to the student.  Like the court in *Clark*, this Court is mindful that it lacks the specialized knowledge and experience necessary to resolve difficult questions of educational policy.  *See id.* at 1028.  In upholding the administrative panel's decision, "the district court [in *Clark*] was careful not to substitute its own notions of educational policy for those of the trained educators."  *Id.*  Given the difference in the procedural postures of the cases, as well as the fact that the student in *Clark* had 394 "challenging behaviors" by March of the school year in question, the Court does not find *Clark* persuasive.

Having considered the four *Michael F.* factors, the Court concludes that the Student's IEP was reasonably calculated for him to receive meaningful education benefits and provided him with a FAPE in accordance with the IDEA.  The Court affirms the decision of the SEHO in the underlying due process hearing.  Accordingly, the Court grants WISD's motion for summary

judgment and denies the Student's motion for summary judgment.

**SO ORDERED.**

Signed March 29, 2022.

_____
ADA BROWN
UNITED STATES DISTRICT JUDGE